UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 08-CV-2864 (JFB)

RAHMELL DANIEL,

Petitioner,

VERSUS

JAMES J. WALSH, Superintendent,

Respondent.

**MEMORANDUM AND ORDER**
November 17, 2009

JOSEPH F. BIANCO, District Judge:

Rahmell Daniel (hereinafter, "Daniel" or "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. On March 7, 2005, following a jury trial in the County Court of the State of New York, Nassau County, petitioner was convicted of manslaughter in the first degree as a lesser-included offense of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. Petitioner was sentenced to concurrent determinate terms of imprisonment of twenty-five years with five years of post-release supervision, fifteen years with five years of post-release supervision, and seven years with three years of post-release supervision, respectively, as well as restitution in the amount of $6,449.00.

On appeal, the New York Appellate Division, Second Department, held that the trial court erred in refusing to charge manslaughter in the second degree as a lesser-included offense of intentional murder and, therefore, vacated the manslaughter conviction. The Second Department, however, concluded that the remaining convictions, *i.e.*, the criminal possession of a weapon in the second degree and third degree, as well as the sentences imposed thereon, were proper and affirmed those convictions. The New York Court of Appeals denied leave to appeal.

Petitioner challenges his remaining convictions in this habeas petition on the following grounds: (1) the criminal possession of a weapon in the second degree charge should have been vacated when the Appellate Division vacated the manslaughter charge because manslaughter was the factual predicate establishing intent for the weapons charge; (2) the trial court failed to suppress petitioner's

pre-trial statements obtained through *Miranda* violations because the petitioner's youth and limited intelligence, in the absence of a parent, rendered his waiver of *Miranda* rights ineffective; and (3) the trial court deprived petitioner of a fair trial by (a) stating that the jury's case was "easier" because the death penalty did not apply and (b) incorrectly invoking the collateral evidence rule to refuse to admit evidence proffered by the defense to show that a major prosecution witness, James Schumeyer, testified falsely regarding a material issue.

For the reasons set forth below, the Court finds that petitioner's first claim – namely, that the weapons charge must be vacated because it was a factual predicate for the manslaughter charge – is procedurally barred from review and, in any event, all of the claims (including the first claim) fail on the merits. Accordingly, Daniel's petition for a writ of habeas corpus is denied in its entirety.

I. BACKGROUND

A. The Underlying Facts

Based upon a review of the petition and underlying record, the Court has set forth below a summary of the evidence presented at petitioner's trial.

1. Evidence Presented By Prosecution

After school on October 22, 2002, petitioner went to his girlfriend's house in Brentwood with his friend, Stephen Rice. (Tr. 865.) Petitioner gave Rice petitioner's gun to hold, which Rice put in his jacket pocket. (Tr. 865-68, 898-99, 1032-33.) Later in the evening, Rice and petitioner left the girlfriend's home and took a train to Farmingdale. (Tr. 868-70.) Upon arriving, they waited at the station parking lot for a friend to pick them up. (Tr. 871.)

Meanwhile, Raul Alvarenga, Edwin Machado, Krystal Douglas, and Yeny Gomez Diaz met at the Farmingdale train station to celebrate Alvarenga's birthday. (Tr. 495, 496.) James Schumeyer, another friend, also joined the group along with three of Alvarenga's other friends and relatives. (Tr. 498.)

While the group was talking, Alvarenga heard petitioner say, "a white boy with a nice truck." (Tr. 499.) Alvarenga turned around to find petitioner and Rice. (Tr. 501.) He exchanged angry words with petitioner, and Schumeyer then got in his Ford Explorer with the three people who arrived with him. (Tr. 501-02.) Before he drove away, Schumeyer warned petitioner, "You better not be here when I get back." (Tr. 502.)

At this point, petitioner asked for the gun back from Rice. (Tr. 879.) When Machado continued the argument, petitioner pulled the gun out. (Tr. 503-04.) Machado got upset and said, "If you're going to kill me you're going to kill everybody that is here with me. (Tr. 505.) Taking off his sweater and jacket, Machado stood bare-chested before petitioner and put out his hands. (Tr. 505.) Schumeyer testified that, while he had not been present during this argument, Alvarenga had told him that Machado had used racially offensive terms such as "chocolate." (Tr. 657.) Others testified that petitioner began taunting Machado, asking him if he was afraid to die and calling him names. (Tr. 956, 958.) As Machado walked toward him, petitioner pulled the trigger and shot Machado in the chest. (Tr. 507.)

Two days later, petitioner was arrested by Detective John McHugh. Three days later,

2

Rice was arrested by Detective Lesmeister.[1] In due course, Rice entered into an agreement with the prosecution that, in return for his testimony at petitioner's trial, he would plead guilty to misdemeanor weapons possession and be sentenced to probation. (Tr. 888-98, 919.)

After being arrested, petitioner was questioned by Detective Lesmeister and Detective Parpan in an interview room. (Tr. 676-80.) Detective Lesmeister issued *Miranda* warnings to petitioner, who indicated that he understood his rights and responded to questioning. (Tr. 681-85.) At first, petitioner denied any part in the shooting. However, when Detective Parpan told petitioner that petitioner's girlfriend had already told Detective Parpan "everything," petitioner changed his statement. (Tr. 686-87.) He stated that he had hidden the gun in a yard on Hudson Street in Farmingdale. (Tr. 694.) After finding this out, Sergeant Lesmeister and Detective Parpan drove petitioner to Farmingdale, where petitioner led the two detectives to the firearm. (Tr. 693-701.)

They returned to the Homicide Squad office, and petitioner agreed to provide a written statement. (Tr. 702-04.) Sergeant Lesmeister began writing down petitioner's statement, which was read and signed by petitioner. (Tr. 713-14.) Petitioner also made a videotaped statement to the Assistant District Attorney. (Tr. 721-22.) At trial, petitioner testified that he was seventeen years old on the day of the shooting. The parties also stipulated that petitioner had an IQ of about eighty and that his reading ability was at the fifth grade level at the time of his arrest. (Tr. 1207.)

---

[1] Detective Lesmeister was promoted to Sergeant prior to the court proceedings in this case.

2. Evidence Presented by Defense

Petitioner testified at the trial and a summary of his testimony is set forth below.

According to petitioner, while in the parking lot at Farmingdale train station, petitioner noticed a truck pull up and join the group that had gathered earlier. Petitioner saw the group give each other hand signals that he recognized to be gang related, specifically of the Hispanic gang known as MS-13. (Tr. 1034-37, 1144-45.) This caused petitioner great distress. (Tr. 1037-39, 1146-48.)

While petitioner and Rice looked at the truck, its driver challenged them. Petitioner and the driver of the truck, exchanged insults, and, according to Rice's testimony, before driving off, the driver threatened that they would be returning with guns. (Tr. 875-76.)

Petitioner then asked Machado what was wrong and why the driver was leaving to get a gun. Machado responded, "shut up black n*****, you talk too much." Petitioner tried to mollify Machado, who responded with further invective. (Tr. 1039-40, 1147-49.) Machado then challenged petitioner to a fight. (Tr. 1040.) Rice handed petitioner the gun that petitioner had asked him to hold, which petitioner displayed to Machado to try to get Machado to retreat. (Tr. 1040-41, 1139, 1146.) Petitioner claims that he had a gun because he had been robbed at the Farmingdale Long Island Railroad train station before and felt he needed to be armed for his protection. (Tr. 1027-32, 1126-31.)

Machado began to take off his clothes while saying, "Come on. I ain't afraid of you, I ain't afraid to die. . . . You can shoot me, I don't care. If you shoot me, you got to shoot everybody here." Petitioner told Machado to relax, but Machado kept coming closer as

3

petitioner was backing up. (Tr. 1044-45.) When petitioner saw Machado make a movement toward a bulge in Machado's waist area, petitioner thought Machado was reaching for a gun. (Tr. 1045-46.) At that point "the gun went off." (Tr. 1045.) Machado fell to the ground, and petitioner fled the scene with Rice. (Tr. 941.)

Petitioner was scared and nervous after the gun went off, and when Rice began to run, petitioner followed him. (Tr. 1048-49.) Rice noticed petitioner was still holding the gun and told him to throw it away. (Tr. 1049-50.)

Several days later, petitioner was arrested. Upon arriving at the Nassau County Police Headquarters, petitioner asked the police to contact his mother. According to petitioner, he was told that he would not be allowed to contact his mother until he made a complete statement as to what happened to Machado. Petitioner was promised that, if he gave such a statement, he would be permitted to go home. (Tr. 1057-62, 1068-72, 1074.) Petitioner helped the police locate the gun that he had buried. (Tr. 1064.) Petitioner was then brought back to the station, where he signed a statement that was written by Detective Lesmeister. (Tr. 1066-68.) With respect to the videotaped statement, petitioner claimed that it was not the truth; rather, he was simply following the directions of Detective Lesmeister. (Tr. 1072.)

B. Procedural History

Prior to trial, petitioner had a full hearing to contest the admissibility of his statements and the physical evidence that was seized. The court issued a written decision that denied petitioner's suppression motion. The hearing court found that there was probable cause for petitioner's arrest and that he voluntarily, knowingly, and intelligently waived his constitutional rights before speaking to the police.

At trial, petitioner was convicted of manslaughter in the first degree (N.Y. Penal Law § 125.20[1]) as a lesser-included offense of murder in the second degree, criminal possession of a weapon in the second-degree (N.Y. Penal Law § 265.03), and criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02). On March 7, 2005, petitioner was sentenced to concurrent determinate terms of twenty-five years' imprisonment, with five years of post-release supervision for the manslaughter conviction, and for the weapons charges, the court imposed concurrent determinate terms of fifteen years' incarceration with five years of post-release supervision, and seven years' incarceration with three years of post-release supervision. Petitioner was also order to pay restitution totaling $6,449.00.

On March 7, 2006, with the assistance of counsel, petitioner appealed his conviction to the New York Appellate Division, Second Department (hereinafter, "Appellate Division"). In his brief submitted to the court, petitioner contended that: (1) the trial court erred when it denied his request for a jury instruction to consider the lesser-included offenses of second-degree manslaughter and criminally negligent homicide; (2) the trial court erred when it denied petitioner's motion to suppress oral, written, and videotaped confessions despite petitioner's ineffective waiver of his Fifth Amendment rights; (3) the trial court judge denied petitioner a fair trial (a) by stating that the jury's case was "easy" because the death penalty did not apply, and (b) by incorrectly invoking the collateral evidence rule to preclude impeachment of prosecution witness James Schumeyer as to whether Schumeyer had heard the decedent direct racial epithets toward petitioner shortly

4

before the gun was shot; and (4) the sentence imposed by the trial court was unduly harsh and excessive. On February 20, 2007, the Appellate Division found that the trial court had erred in refusing to charge manslaughter in the second degree as a lesser-included offense of intentional murder. Accordingly, the state appellate court vacated petitioner's conviction for manslaughter in the first degree. The Appellate Division determined that it need not reach the issue regarding the impeachment of Schumeyer's testimony because the manslaughter conviction was vacated and denied petitioner's remaining claims. *People v. Daniel*, 830 N.Y.S.2d 319 (App. Div. 2007). Petitioner filed leave to appeal to the New York Court of Appeals on his remaining grounds for appeal. On July 3, 2007, the Court of Appeals denied petitioner leave to appeal from the Appellate Division's order. *People v. Daniel*, 9 N.Y.3d 864, 864 (2007).

## C. The Instant Petition

On July 14, 2008, petitioner filed the instant petition before this Court. Petitioner's first claim contends that his criminal possession of a weapon in the second degree conviction should have been vacated by the Appellate Division because that charge was factually connected to the second-degree murder charge of which he was acquitted and the first-degree manslaughter charge that was vacated, and because there was no evidence at trial that established that he intended to use the gun unlawfully against another. Petitioner also raises the second and third claims that he had submitted on direct appeal to the Appellate Division. This Court issued an Order to Show Cause on July 18, 2008. A response in opposition was filed on September 19, 2008. Petitioner moved for the appointment of counsel on October 14, 2008. The Court denied petitioner's motion on October 20, 2008. This matter is fully submitted.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

5

decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

A. Procedural Issues

1. Failure to Exhaust

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333 (2007), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (quotation marks omitted) (alteration in original)).

However, "it is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard*, 404 U.S. at 275-76. On the contrary, to provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Duncan*, 513 U.S. at 365-66. "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts

6

in federal court.'" *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at 191)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191-92 (citing *Picard*, 404 U.S. at 276; *United States ex rel. Cleveland v. Casscles*, 479 F.2d 15, 19-20 (2d Cir. 1973)). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

2. State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (additional citations and emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). Therefore, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Keane*, 118 F.3d at 139 (quoting *Hoke*, 933 F.2d at 120 (quoting *Harris*, 489 U.S. at 263 n.9)).

However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 744-51). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Netherland*, 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect that state judgments must be accorded. *See House v. Bell*, 547 U.S. 518, 536 (2006). Petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on adequate and independent procedural grounds. *See Coleman*, 501 U.S. at 729-33. The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Id.* at 730-31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting

7

therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### 3. Application

As a threshold matter, respondent argues that petitioner's first claim in the instant petition, contending that the criminal possession of a weapon in the second degree charge should have been vacated, is procedurally barred and that petitioner has failed to demonstrate any grounds to overcome this procedural bar. The Court agrees.

Petitioner has not demonstrated that he presented his first claim to the Appellate Division on direct appeal. On direct appeal, petitioner did not raise any claim that there was a lack of proof as to his intent to use the weapon. Nor did petitioner argue that vacatur of his manslaughter conviction would require vacating the second-degree weapon possession conviction. Petitioner thus failed to raise this claim on direct appeal and, as discussed below, there is now no procedural mechanism for petitioner to bring this claim before any state court.[2] However, because petitioner no longer has any further remedies available to him in the New York State courts with respect to this claim, he meets the technical requirements for exhaustion. *Coleman*, 501 U.S. at 732. Thus, the claim is deemed exhausted under 28 U.S.C. § 2254(b).

Nonetheless, petitioner's first claim is procedurally barred. Where "'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (quoting *Coleman*, 501 U.S. at 735 n.1). In New York, a defendant may not collaterally attack a conviction based on a claim that he could have raised on direct appeal where he unjustifiably failed to raise it. N.Y. Crim. Proc. Law § 440.10(2)(c); *see, e.g.*, *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003). Petitioner's inability to return to state court provides an independent and adequate state ground upon which his claim is procedurally defaulted.

Furthermore, petitioner has not shown cause for, or prejudice resulting from, the default. Here, petitioner did not make any attempt to explain his failure to raise the claim in a timely manner, nor has he demonstrated that a fundamental miscarriage of justice would occur if these claims were not reviewed by the habeas court. Not only is petitioner's application devoid of any claim of actual innocence, but the evidence presented at trial established petitioner's guilt beyond a reasonable doubt. Accordingly, petitioner has failed to present any circumstances to overcome the procedural bar that renders his claims exhausted but procedurally defaulted.

---

[2]Although petitioner's leave letter to the New York Court of Appeals can be characterized as raising petitioner's first claim, respondent correctly notes that raising a claim for the first time in an application for discretionary review does not constitute "fair presentation" of the claim for the purposes of exhaustion unless the court considers that claim. *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000). The Court of Appeals did not consider petitioner's claim, but rather denied leave to appeal.

In any event, in an abundance of caution, the Court has analyzed the merits of the procedurally barred claim (along with all other claims) and concludes that none of the claims provides a basis for granting habeas relief in this case on the merits.

### B. The Merits

#### 1. Claim Regarding Manslaughter As Factual Predicate to Intent for Second-Degree Criminal Possession of a Weapon

Petitioner argues that his conviction for criminal possession of a weapon in the second degree should have been vacated when the Appellate Division vacated the manslaughter in the first degree conviction because "manslaughter was the factual predicate establishing intent." (Daniel's Petition ("Pet.") at 5.) Petitioner's claim fails on the merits.

First, as respondent correctly notes, the second-degree weapon-possession statute at the time of petitioner's crime provided: "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another [he] possesses a loaded firearm." N.Y. Penal Law § 265.03(2) (2002). The law does not make homicide a predicate to finding criminal possession of a weapon. Individuals may be charged with and convicted of criminal possession of a weapon in the second degree without any accompanying or predicate homicide charge. *See*, *e.g.*, *People v. Torres*, 821 N.Y.S.2d 206, 206-07 (App. Div. 2006); *People v. Clanton*, 796 N.Y.S.2d 795, 796 (App. Div. 2005) (finding that the jury did not reach an "inherently self-contradictory verdict" when defendant "was acquitted of robbery in the first degree, but convicted of criminal possession of a weapon in the second degree").

There was also sufficient proof of petitioner's intent to possess the weapon. Intent, like any other "mens rea . . . will usually depend upon reasonable inferences from those objective facts" presented at trial. *United States v. Bailey*, 444 U.S. 394, 417 (1980). In this case, petitioner shot fifteen-year-old Machado in the chest. Petitioner also taunted Machado by stating, "You think I won't shoot?" and calling him names (Tr. 528, 879-80, 882), which further indicated his intent to use the gun. Indeed, at trial during petitioner's summation, petitioner's counsel conceded that the jury could "convict him of" the criminal possession charges in lieu of a homicide conviction. (T. 1260-61.)

Accordingly, at trial, there was sufficient evidence concerning the gun count to establish intent. The petitioner's claim that he lacked the requisite intent to be convicted of criminal possession of a weapon in the second degree is without merit and does not provide a basis for habeas relief.

#### 2. Self-Incrimination Claim

Petitioner further claims that his pre-trial motion to suppress statements should have been granted because his waiver of his *Miranda* rights was involuntary. Specifically, petitioner argues that his waiver of his *Miranda* rights, in the absence of a parent, was ineffective because of his youth and limited intelligence. As set forth below, the Court concludes that this claim also lacks merit.

##### a. Legal Standard

For a petitioner to prevail on his *Miranda* claim, he must demonstrate that the trial court's denial of his motion to suppress his post-arrest statement was either (1) contrary to, or an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). In the instant case, as set forth below, the factual findings of the New York courts are

9

presumed to be correct because they were made after extensive development of the material facts and were supported by the record. In short, petitioner has not demonstrated that there were any unreasonable factual findings; rather, having reviewed the record, this Court concludes that the denial of the suppression motion was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court also finds the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

Furthermore, the *Brecht* standard of harmless error review applies regardless of whether petitioner's rights were violated due to *Miranda* violations or physical coercion. The more stringent *Brecht* standard, applicable to collateral review of state court error, asks "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict[,]'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), and shifts the burden of proof from the state to the petitioner. *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). Thus, "[h]abeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (citing *Brecht*, 507 U.S. at 637). Thus, even assuming *arguendo* that petitioner's constitutional rights had been violated, under the *Brecht* standard of review, petitioner's claim warrants no relief.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)); *see also Mincey v. Arizona*, 437 U.S. 385, 396 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; "[i]nstead, this Court is under a duty to make an independent evaluation of the record"). Factual questions underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d); *Nelson*, 121 F.3d at 833-34. Specifically, this Court is required to give deference to the state court's factual determinations, and petitioner bears the burden of rebutting those determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001) (holding that under AEDPA, "'a determination of a factual issue made by a State court shall be presumed to be correct[, and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence" (quoting 28 U.S.C. § 2254(e)(1))). However, the Second Circuit has noted that the "statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Nelson*, 121 F.3d at 833 (citation and internal quotation omitted). Thus, "[i]f the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record, the presumption of correctness is set aside." *Id*. (citation and internal quotation omitted). When evaluating the voluntariness of a confession, no one factor is determinative; rather, the totality of the circumstances must be evaluated. *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The factors to be considered include (1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials. *Id*. at 901-02.

b. Application

Petitioner claims that, under the totality of the circumstances, his waiver of *Miranda* rights was invalid because he was sixteen years old with a stipulated IQ of 80 and he did not have a parent present. As set forth below, the Court finds these arguments to be without merit. As a threshold matter, with respect to his age, petitioner's allegation that he was sixteen years old during the interrogation is contrary to his own testimony at trial. Petitioner testified at trial that he was seventeen years old on the day of incident. (Tr. 1025.) *See, e.g.*, *Bridges v. Chambers*, 447 F.3d 994, 998 (7th Cir. 2006) ("All of these sources [cited by petitioner] are unpersuasive for the same reason: None involve Supreme Court precedent that clearly established that 17-year-olds must be considered juveniles.") In any event, even assuming *arguendo* that petitioner was sixteen at the time of his arrest, age is only one factor in assessing voluntariness; a waiver is not automatically invalidated because of age. *See Fare v. Michael C.*, 442 U.S. 707, 725-26 (1979) (finding confession admissible because sixteen year old validly waived constitutional rights); *Nova v. Bartlett*, 211 F.3d 705, 708 (2d Cir. 2000) (finding statements made by "a teenager without a high school diploma who had little experience with the law" voluntary); *United States v. Bourrous*, 147 F.3d 111, 116 (2d Cir. 1998) (holding sixteen year old's confession voluntary and admissible); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding waiver of *Miranda* rights by young individual with poor grasp of English language voluntary when questioning by police was not coercive or overbearing). Instead, the voluntariness of the confession is examined under the totality of the circumstances. *See, e.g.*, *Bridges*, 447 F.3d at 997 ("Essentially, [petitioner] argues his supposed juvenile status entitles him to an evidentiary presumption where none exists. 'This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved.'" (quoting *Fare v. Michael C.*, 442 U.S. at 725)).

Petitioner also argues that, because he was sixteen years old at the time of the interrogation, his parents should have been notified of his arrest. As noted above, petitioner himself acknowledged at trial that he was seventeen at the time of his arrest. New York's parental notification statute was not applicable to petitioner, whether he was sixteen or seventeen at the time of his arrest, because that statute is only applicable to children *under* sixteen. N.Y. Family Court Act § 305.2; *see In re Manuel B.*, 781 N.Y.S.2d 595, 597-98 (Fam. Ct. 2004). In any event, even assuming *arguendo* that parental notification was required under state law or the federal Juvenile Delinquency Act, 18 U.S.C. § 5033, the absence of a parent does not automatically invalidate a waiver of *Miranda* rights because, as with age, it is just one factor to be taken into account in determining the voluntariness of a confession. *See Fare v. Michael C.*, 442 U.S. at 725; *Burrous*, 147 F.3d at 115-16; *United States v. Doe*, 170 F.3d 1162, 1166-68 (9th Cir. 1999) (holding that lack of parental notification is not a per se due process violation that warrants voiding a juvenile's *Miranda* waiver). Accordingly, petitioner's age and the absence of parental notification prior to his questioning do not, by themselves, establish a basis for habeas relief; rather, the court examines the totality of the circumstances. *See, e.g.*, *Gilbert v. Merchant*, 488 F.3d 780, 793 (7th Cir. 2007) ("[T]he absence of a parent is not dispositive; it is the totality of the circumstances underlying a juvenile confession, rather than the presence or absence of a single circumstance, that determines whether or not the confession should be deemed voluntary.").

The analysis is the same with respect to plaintiff's intellectual ability.[3] Petitioner claims that, due to his low IQ, he was unable to knowingly waive his rights. However, low IQ by itself does not render the waiver involuntary. Instead, for a waiver of *Miranda* rights to be deemed involuntary, an individual must be "so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 40 (2d Cir. 1997) (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987) and citing *Toste v. Lopes*, 701 F. Supp. 306, 313-14 (D. Conn. 1987) *aff'd*, 861 F.2d 782, 783 (2d Cir. 1988) (per curiam) (although psychological testimony indicated that petitioner was 'mildly retarded' and of 'dull normal intelligence,' the evidence did not show an inability to knowingly waive his rights")); *see also Clark v. Mitchell*, 425 F.3d 270, 283-84 (6th Cir. 2005) ("[Borderline retardation . . . or 'low average intellect' . . . is not dispositive" of the voluntariness of a defendant's waiver of his constitutional rights); *People v. Williams*, 62 N.Y.2d 285, 287 (1984) (a borderline mentally retarded man was capable of waiving his constitutional rights).

Here, there is more than sufficient evidence to support the state court's determination, under the totality of the circumstances, that petitioner voluntarily made incriminating statements after being advised of his *Miranda* rights. In particular, the following evidence from the suppression hearing, *inter alia*, regarding the circumstances of the questioning supports the reasonableness of that determination: (1) petitioner arrived at the police station around 3:20 p.m. (H. 22, 84); (2) he immediately was given a soda and sat unhandcuffed for some period of time (H. 21- 23, 84); (3) he orally waived his *Miranda* rights and also indicated his waiver by writing the word "yes" on the *Miranda* card, and then initialing and signing the card (H. 23-27); (4) at about 5:25 p.m., petitioner left the stationhouse with several police officers in order to retrieve the gun he had hidden following the shooting and, after locating the gun, returned to the police station where he had pizza and soda, and again waived his *Miranda* rights and signed a *Miranda* card (H. 39-42); (5) even though petitioner did not request to telephone his mother or anyone else, he telephoned his mother at 9:30 p.m. at a detective's suggestion and told her to cooperate with the police in retrieving his cell phone (H. 50-51); (6) with respect to the videotaped confession, petitioner arrived at the District Attorney's office around 10:30 p.m. (H. 51- 54); (7) he was interviewed on videotape until 11:30 p.m. and, during such interview, petitioner was never promised anything, never asked for an attorney, and never indicated that he did not wish to speak with the police (H. 53- 61). Moreover, there was no suggestion of physical abuse or coercion of any kind. In addition, with respect to his intellectual capacity, it was established at the suppression hearing, *inter alia*, that he attended school, was able to read and write, could recall his address, as well as his social security and telephone numbers. (H. 27-28.) He was able to think quickly enough to hide the weapon. (H. 16, 41.) Based upon all of the evidence, there was certainly sufficient evidence to refute the claim that petitioner's IQ was low enough to invalidate his waiver. In short, there is no basis to disturb the state court's finding after a full hearing, that petitioner was properly given the *Miranda* warnings, and his waiver was voluntary. Any evidence derived as a result of petitioner's confession was also correctly admitted into evidence because "derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation." *Bruno v. Cunningham*, No. 03 Civ. 937 (MBM), 2004

---

[3] As an initial matter, the Court notes that petitioner failed to raise the issue of IQ at the suppression hearing. In any event, such claim is without merit for the reasons discussed *infra*.

WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citing *Oregon v. Elstad*, 470 U.S. 298, 308 (1985)).

In sum, after an extensive review of the record, the Court concludes that the trial court's determination of petitioner's *Miranda* claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. The totality of the circumstances surrounding petitioner's waiver does not suggest that his waiver was involuntary. Furthermore, any *Miranda* violation would be harmless error under the applicable *Brecht* standard due to the overwhelming evidence of petitioner's guilt. Apart from the confession, there were five witnesses who identified him as the person who used the gun to shoot Machado.

Accordingly, the *Miranda* claim fails on the merits and does not provide a basis for habeas relief.

### 3. Fair Trial Claim

Petitioner argues that he was deprived of a fair trial: (1) when the trial judge told the jury that the death penalty was not an option in the instant case and that this knowledge "might make this very hard job that we all have just the slightest easier" (Tr. 103); and (2) when the trial court precluded the introduction of testimonial evidence to impeach a witness. Both of these claims fail on the merits.

### 1. Judicial Intervention/ Bias Claim

Petitioner claims that the trial judge's biased treatment of defense counsel before the jury deprived petitioner of his fundamental right to a fair trial. Specifically, petitioner alleges that the court created bias against the defense when it stated that the jury's case was made "easier" because the death penalty did not apply to this case. Petitioner argues that this statement made it appear that the petitioner was already presumed to be guilty. As set forth below, the Court finds this claim to be without merit.

Petitioner appears to argue both excessive judicial intervention and judicial bias as bases for this due process claim. Under the federal habeas review, a petitioner faces a high hurdle in demonstrating he was constitutionally deprived of a fair trial because of biased treatment by a state trial judge. Although "prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause," *Daye v. Attorney General*, 712 F.2d 1566, 1570 (2d Cir. 1983), *cert. denied*, 464 U.S. 1048 (1984), "a federal [habeas] court will not lightly intervene when such a claim is asserted." *Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir. 1985). The "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either [1] impaired functioning of the jury or [2] lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Daye*, 712 F.2d at 1572. In determining either, both the quantity and significance of the statements ought to be weighed. *Id*. (referring to the "quantity and nature of the trial judge's questioning").

The Second Circuit has acknowledged that the standard for determining when exactly a state judge engages in impermissible intervention is "'somewhat ill-defined.'" *Gayle*, 779 F.2d at 806 (quoting *Johnson v. Scully*, 727 F.2d 222, 226 (2d Cir. 1984)). However, case law regarding review of judicial intervention claims in federal criminal trials provides useful guidance here. In reviewing a federal judge's conduct, the Second Circuit has made clear that the judge's behavior must be "so prejudicial that it denied [petitioner] a fair, as distinguished from a perfect, trial." *United*

13

*States v. Robinson*, 635 F.2d 981, 984 (2d Cir. 1980), *cert. denied*, 451 U.S. 992 (1981). The issue is not one of "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985). "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether 'it appeared clear to the jury that the court believed the accused is guilty.'" *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996) (quoting *United States v. Nazzaro*, 472 F.2d 302, 303 (2d Cir. 1973)).

In conducting its review, a court "must make 'an examination of the entire record,' in order to determine whether the defendant received a fair trial." *United States v. Mickens*, 926 F.2d 1323, 1327 (2d Cir. 1991) (quoting *United States v. Bejasa*, 904 F.2d 137, 141 (2d Cir. 1990)). It would be improper for the judge's statements to be "judged in isolation from the totality of the record through the dispassionate looking glass of hindsight . . . ." *Bejasa*, 904 F.2d at 141. By placing the individual statements in the context of the entire record, certain factors may be found to have mitigated their prejudicial effect. *See Martinez v. Kelly*, No. 01 Civ. 11570, 2005 U.S. Dist. LEXIS 42952, at *17 (S.D.N.Y. Aug. 4, 2005). For example, "a trial court's negative comments to or about defense counsel are typically not viewed as compromising the fairness of a trial where they were *provoked* by defense counsel himself." *Id.* (emphasis added); *see also Mickens*, 926 F.2d at 1327. "In addition, the prejudicial effect of a trial court's comments 'can be cured by the court's cautionary instruction' to the jury." *Martinez*, 2005 U.S. Dist. LEXIS 42952, at *17 (quoting *Mickens*, 926 F.2d at 1327-28). In sum, the reviewing court should embark on a holistic evaluation "requir[ing] a close scrutiny of each tile in the mosaic of the trial so that [it] can determine whether instances of improper behavior or bias, when considered individually or taken together as a whole, may have reached the point where [it] can make a safe judgment that the defendant was deprived of the fair trial to which he is entitled." *Nazzaro*, 472 F.2d at 304.

In the instant case, this Court concludes that the state court correctly determined that the comments "although better left unsaid, did not, under the circumstances of this case, deprive the defendant of a fair trial." *Daniel*, 830 N.Y.S.2d at 321. As set forth below, this isolated statement by the trial judge did not convey a partiality to the jury that would have factored into its determination of petitioner's guilt, nor did it express a bias that undermined the appearance of a fair trial.

As a threshold matter, it is important to analyze the context of the statement. The trial judge's statement, of which petitioner complains, was prompted by certain statements by defense counsel. In particular, during jury selection, defense counsel stated that petitioner's "life is at stake" on two occasions. (Tr. 77, 94.) In order to promote accuracy and avoid jury confusion, the court told jurors that the court had

> omitted to tell [the potential jurors] something that might make this very hard job that we all have just the slightest [bit] easier, it might make you feel a little easier in your mind[,] and that is . . . [t]his defendant, Mr. Daniel, does not face the death penalty. Does not face the death penalty. So that makes the job a little bit easier to do. I hope so.

Because the defense counsel perhaps had given the jurors a misimpression that defendant might be facing the death penalty, the court's remedial instruction was designed to correct a situation created by defense counsel.

In any event, the phrasing of the statement by the trial judge did not deprive petitioner of a fair trial. The instruction was given in the overall context of the trial court's repeated instructions that punishment was not a concern for the jury (Tr. 31, 1306); that punishment, "only in the event it becomes necessary," rests with the court alone (Tr. 1306); that the verdict was to be based on evidence and evidence alone, not sympathy, prejudice, or other illegitimate factors (Tr. 1306-07, 1312); and that the court held no views as to defendant's guilt or innocence, and that any such views would be irrelevant (Tr. 1307-08). In short, any error in the statement by the trial court did not deprive defendant of due process.

In addition, proof of the defendant's guilt was overwhelming. Not only did Daniel confess multiple times, but there were five witnesses who identified him as the person who shot Machado. Forensic evidence also proved that the final bullet came from the gun that petitioner hid. Thus, had the trial judge's interventions amounted to constitutional error, the violation would be subject to harmless error review under *Brecht*. Based on the overwhelming evidence of petitioner's guilt, the jury would have found petitioner guilty regardless of any improper judicial intervention.

In sum, this Court finds no basis to conclude that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the statement by the trial court during jury selection does not provide a basis for habeas relief under the circumstances of this case.

2. Claim Regarding Evidentiary Ruling

Petitioner also claims that the court improperly prohibited the defense from impeaching prosecution witness James Schumeyer by calling a defense investigator, Joseph DiBennidetto, to impeach certain statements made by Schumeyer during his testimony. At trial, Schumeyer denied hearing Machado call petitioner racial epithets. According to petitioner, DiBennidetto would have testified that Schumeyer told him that he had heard Machado or one of the other persons present make racial epithets directed toward petitioner.

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983); *see generally Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations omitted) ("[H]abeas corpus relief does not lie for errors of state law."). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived [him] of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'") (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted)).

To constitute a denial of due process under this standard, erroneously admitted or omitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove [or create] a reasonable doubt that would have existed on the record without it.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotation marks omitted)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant") (internal quotation marks and citation omitted). Moreover, the court must review the

erroneously admitted or omitted evidence "'in light of the entire record before the jury.'" *Dunnigan*, 137 F.3d at 125 (quoting *Collins*, 755 F.2d at 19 (internal quotation marks omitted)). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello*, 333 F.3d 51, 58, 59 n.7 (2d Cir. 2003). As set forth below, the Court has reviewed petitioner's objection to the excluded evidence under this two-part test and concludes that the claim does not warrant habeas relief.

First, the trial court's decision to preclude the testimony of DiBennidetto under the collateral evidence rule was correct under New York law. The collateral evidence rule bars parties from "introduc[ing] extrinsic evidence on a collateral matter solely to impeach credibility." *People v. Alvino*, 71 N.Y.2d 233, 247-48 (1987) (citations omitted). However, "answers to questions that have a direct bearing on an issue in the trial do not come within the [collateral evidence rule]. . . . 'Direct, in this context, means any evidence tending to prove the proponent's case on the merits or to disprove the opponent's, even though this direct evidence, if believed, might also contradict, undermine or discredit a witness.'" *Bell v. Ercole*, No. 05 CV 4532 (ERK), 2008 WL 2484585, at *24 (E.D.N.Y. June 20, 2008) (quoting Prince, Richardson on Evidence § 6-305 (Richard T. Farrell ed., 11th ed. 1995) and citing *People v. Hudy*, 73 N.Y.2d 40, 56 (1988)). "[E]vidence of a witness' bias must be competent to be admissible, and the trial court has broad discretion to curtail exploration of collateral matters." *Justice v. Hoke*, 90 F.3d 43, 48 (2d Cir. 1996) (citing *People v. Hudy*, 73 N.Y.2d 40, 56 (1988)). Here, the trial court correctly determined, in its broad discretion, that the proposed testimony was prohibited by the collateral evidence rule and was also irrelevant. (Tr. 976-77.)

Second, even assuming *arguendo* that the ruling was erroneous under New York law, it did not result in a denial of the constitutional right to a fundamentally fair trial, including petitioner's right to present a defense. To obtain relief on this ground, petitioner must demonstrate not merely that the trial court's evidentiary ruling was incorrect, but that "'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice*, 90 F.3d at 47 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). Evaluated in the context of the entire record below, the omitted testimony of DiBennidetto does not create a reasonable doubt that did not otherwise exist as to petitioner's guilt. The trial court excluded DiBennidetto's testimony on the peripheral issue of whether Schumeyer heard Machado used racial slurs or insults. Machado's statements toward petitioner, regardless of their nature, could not create any reasonable doubt as to whether or not petitioner shot Machado. Nor would DiBennidetto's testimony, if deemed credible by the jury, have provided petitioner with a defense for his use of deadly force. Accordingly, this proposed testimony on a collateral matter – namely, Schumeyer's acknowledgment that he overheard the victim's statement prior to the shooting – had no impact on petitioner's right to a fundamentally fair trial, including his constitutional right to present a defense.

Finally, even assuming *arguendo* the ruling had some impact on the manslaughter conviction and was constitutionally erroneous, such error was harmless as it related to the remaining convictions. DiBennidetto's testimony regarding Schumeyer's statements would only have been potentially relevant to the manslaughter charges, and the Appellate Division vacated petitioner's manslaughter conviction. Thus, even if the trial court's

refusal to permit the testimony of DiBennidetto on Schumeyer's statements were deemed an abuse of its broad discretion, the error was harmless under the applicable *Brecht* standard.

### III. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court has reviewed all of petitioner's claims and finds them to be without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: November 17, 2009
Central Islip, NY

\* \* \*